UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DUWAYNE E. RUTLAND, | ) |
| | ) |
|   Plaintiff, | ) |
| | ) |
|     vs. | ) CAUSE NO. 1:12-cv-189-WTL-DML |
| | ) |
| TARGET CORPORATION, | ) |
| | ) |
|   Defendant. | ) |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (dkt. no. 50). The motion is fully briefed and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.[1] Also pending is the Defendant's motion to strike certain exhibits and to sanction the Plaintiff for fabricating those exhibits (dkt. no. 62). Because the exhibits were not material to the Court's decision, the Court **denies as moot** the motion regarding them.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable

---

[1] The Plaintiff submitted a large stack of documents along with his response to the Defendant's motion for summary judgment. Included in that stack was a document entitled Motion for Summary Judgment. That document references a "brief in support of Plaintiff's motion for summary judgment" and a "Designation of Evidence in Support of [his] motion for summary judgment," neither of which was included in the stack of documents or otherwise submitted to the Court. Because the Plaintiff's purported motion for summary judgment was not accompanied by a brief and therefore does not include any legal argument or evidentiary support, the Court has not considered it. The Court notes, however, that the briefing of the Defendant's motion for summary judgment demonstrates that the Plaintiff would not have been entitled to summary judgment even if he had filed an appropriately supported motion.

inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).[2]

## II. FACTUAL BACKGROUND

Plaintiff Duwayne Rutland brings this case against his former employer, Target Corporation ("Target"). The relevant facts of record, considered in the light most favorable to Rutland, are as follow.

Rutland began working for Target in West Jefferson, Ohio, in 2004. His employment was terminated by Target in October 2006 while he was on medical leave.

In April 2011, after relocating to Indianapolis to attend aviation maintenance school, Rutland applied to work for Target in Indianapolis. Target Senior Group Leader Todd Davis interviewed Rutland and made the decision to hire him. Rutland informed Davis that he would be attending school and was told that "there was no problem with him attending school full-time." Rutland also informed Target human resources employee Julie Wells about his classes when she called to offer him the job.

At the outset of their employment, new employees at Target are subject to an initial

---

[2]The Plaintiff is proceeding *pro se* in this case and was provided with the notice required by Local Rule 56-1(k).

90-day probationary period referred to as a "Learning Period." As with all new employees, Rutland's first 90 days were thus considered a probationary Learning Period. Target also has a Temporary Schedule Exceptions policy. Under the Temporary Schedule Exceptions policy, employees who have successfully completed their 90-day Learning Period can request permission to alter their schedules to miss a portion of their regular shifts. This policy is primarily used by employees who need to miss part of a scheduled shift on a regular basis to attend classes, but it can also be used as a temporary solution for employees needing to arrive late or leave early to take care of childcare needs and similar situations. To request a temporary schedule exception to accommodate a school schedule, an employee must complete a request form and generally must submit it at least fourteen days prior to the schedule exception request date, along with documentation from the school about the relevant class. This request is submitted first to the employee's immediate supervisor (referred to by Target as a "Group Leader"); if approved by the Group Leader, it is then passed on to senior leadership for approval. Approval is not guaranteed; rather, it is dependent upon the business needs of the Target location in question.

      Rutland's employment began at Target's Indianapolis Distribution Center in June 2011. Rutland was assigned to the A-1 shift, which ran from 6:00 a.m. to 6:00 p.m. every Saturday, Sunday, and Monday. Rutland's Group Leaders on the A-1 shift were Kevin Geary and Jason Shonkwiler, both of whom reported to Davis.

      Rutland was assigned to work on the warehouse dock unloading semi-truck trailers. During his orientation, Rutland received Target's Team Member Handbook and training on the various employee policies that applied to him.

On Monday, June 20, 2011, Rutland left his shift over an hour early to go to a class. After Rutland left the building, he realized that he had left his car keys in the building. Because Rutland had failed to bring all of the required paperwork with him to his orientation, he had not yet received a regular Team Member identification badge that would give him access to the building. Rutland therefore had to wait for the security guard to return to his post to open the door; when he did, he let Rutland enter the lobby, but he refused to allow him to enter the work area of the warehouse to retrieve his keys because he did not have a badge. The guard called Group Leader Geary and the human resources department. As he was waiting in the lobby, Rutland became agitated and expressed his concern to the security guard that he was going to be late for his class. A human resources representative and Geary both came to the lobby within a few minutes and asked Rutland why he was leaving his shift early. Rutland responded that he needed to leave for a class. Rutland was given his car keys and informed that he would need to complete a request under the Temporary Schedule Exception policy to leave work early in the future. Rutland believed that he had made such a request during his interview with Davis and that it had been approved.

The following week, Rutland requested a schedule exception to leave his shift early to attend classes on Monday evenings as he had been instructed to do by Geary. Geary later told him that the request had been denied by human resources. Rutland asked to speak to Davis about the issue, but was told he needed to speak to human resources. Geary told him that "You're lucky I didn't hire you. Because if I'd hired you, if I'd been at the interview, I wouldn't have hired you. Because I don't hire you type of people." Rutland Dep. at 149. Geary further told Rutland that he needed to "give him 90 days," and that after his probationary period was up he would be able to arrange his work schedule around his school schedule. *Id.* at 180-81.

On Monday, June 27, 2011, Rutland told Geary that he was leaving his shift early to attend class that evening. Geary told Rutland that since his schedule exception request had not been approved, the time Rutland missed from his shift would be considered accountable time for purposes of Target's attendance policy and could lead to corrective action. Geary also told Rutland that since he was still in his 90-day Learning Period, Geary would have to discuss any additional early, unauthorized departures from work with human resources, because Rutland had already left early the week before without authorization.

At Rutland's request, Geary further discussed Rutland's request to leave his shift early with human resources and with his supervisor, Davis. Davis reiterated that Rutland's exception request would not be approved while Rutland was still in his 90-day Learning Period. After discussing the matter with Davis, Geary again informed Rutland that his schedule exception request was not approved. Geary was informed later that day that Rutland had left his shift early to go to class despite the denial of his exception request and despite his conversation that day with Geary.

Rutland's next scheduled day of work was Saturday July 2, 2011. Rutland called around 1:00 a.m. that day and left two messages stating that his car had broken down, he was waiting for a tow truck, and once the tow truck arrived he would be in to work. Despite these messages, Rutland failed to appear for work that day and failed to call in again to indicate that his plans had changed and that he would be absent. Because Rutland failed to appear for work without calling in to say he would be absent, Rutland's absence was classified as a no-call/no-show, which would constitute grounds for corrective action under Target's Counseling and Corrective Action Policy against Team Members who had completed their 90-day Learning Period.

Rutland again left work early without authorization to go to class on Monday, July 11, 2011. When Rutland returned to work the next Saturday, Geary again discussed with him the fact that his schedule exception request had not been approved and that his continuing to leave work early without authorization, combined with his no-call/no-show the previous week, were problematic. Rutland said that he understood but stated that he needed to attend class.

Later that same day, Geary observed Rutland talking on his cell phone while walking on the warehouse floor heading back to his work station, which is a safety violation that would warrant corrective action against a regular Team Member who had completed his or her 90-day Learning Period. When Geary observed Rutland violating this rule, he approached Rutland and reminded him that Target's policy prohibited the use of cell phones outside of the break room.

Shortly after observing Rutland talking on his cell phone, Geary spoke with his supervisor, Davis, about the numerous issues with Rutland. The two of them discussed Rutland's "repeatedly leaving his shift early without approval despite denial of his exception request, his using his cell phone on the warehouse floor in violation of company policy, and his recent no-call/no show" and, based on those "repeated policy violations and ongoing unreliability," Davis decided to terminate Rutland's employment. Davis Declaration at ¶¶ 10-11. Davis and Geary met with Rutland later that day to inform him that his employment was being terminated effective that same day, July 16, 2011.

Rutland is African-American. During the course of his employment, Geary made several comments to Rutland relating to his race.[3] On one occasion he asked Rutland what school he

---

[3] The Court recognizes that Geary denies making these statements, but accepts Rutland's testimony regarding them as true pursuant to the summary judgment standard. Rutland also references statements made by other people regarding Geary's attitude toward and treatment of black employees. Those statements are not admissible because they are hearsay; accordingly, the Court may not, and has not, considered them.

6

was attending; when Rutland told him it was the aviation technology school, Geary responded, "Oh, now blacks are taking over the aviation field." Rutland Dep. at 146. On another occasion Rutland locked his keys in his car, and Geary commented: "A black intelligent man wouldn't lock his keys in the car, especially one that is going to the Aviation Institute of Maintenance." *Id.* at 205. Geary also asked Rutland if he knew "how many black people would love to have this opportunity to make this kind of money."

### III. DISCUSSION

The first issue that must be addressed is what claims Rutland has properly asserted in this case. Rutland filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in August 2011 asserting that Target fired him because of his race. His Complaint in this Court was submitted on a form entitled "Complaint Under Title VII for Discrimination"; however, in addition to referencing "racial and threatening slurs" during his employment in Indianapolis, the factual narrative contained in the Complaint also refers to the fact that he was terminated in Ohio and not rehired when he was medically able to return to work. It also suggests that Target's knowledge of his past illness may have contributed to the decision to terminate him from his Indianapolis position. Consistent with these factual allegations, in his response to Target's motion for summary judgment, Rutland references both Title VII and the Americans with Disabilities Act ("ADA").

Rutland cannot pursue an ADA claim against Target in this case, however, because he did not include such a claim in his EEOC charge.

> A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if his allegations fall within the scope of the charges contained in the EEOC complaint. To determine whether the allegations in the complaint fall within the scope of the earlier EEOC charge, we must look at whether the allegations are like or reasonably related to those contained in the charge. Claims are reasonably related if there is a factual relationship between them. That means that the EEOC

7

>charge and the complaint must, at minimum, describe the same conduct and
>implicate the same individuals.

*Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001) (citations and internal quotation marks omitted). Rutland's EEOC charge alleges only that he was terminated because of his race and his color. He neither checked the "disability" box on the form nor referenced any actual or perceived disability in the facts he included on the form. An allegation that you were fired because you have had an illness in the past is not reasonably related to an allegation that you were fired because of your race. Nor can Rutland assert an ADA claim in this case for his termination in 2006—not only was that termination not raised in his EEOC charge, but it would have been untimely.[4] Accordingly, to the extent that Rutland has attempted to assert an ADA claim against Target in this case, that claim is without merit.

Rutland's brief also discusses an injury that he suffered while working at Target. The Court does not read Rutland's Complaint or his brief to suggest that he is asserting a claim relating to that injury or the workers compensation claim that followed; to the extent that he did intend to raise such a claim, it fails for a variety of reasons, including the failure to articulate it.

Turning to Rutland's race discrimination claim, which is properly before this Court, Rutland has not attempted to proceed under the "indirect" method,[5] so the Court will analyze his claim under the "direct" method. "Under the direct method of proof, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motive." *Perez v.*

---

[4]Similarly, to the extent that Rutland seeks to sue Target under the Family Medical Leave Act ("FMLA"), to which he alludes in his brief, for terminating him from his position in Ohio in 2006, that claim is time barred. Any claim under the FMLA must be filed within either two years or, for willful violations, three years. 29 U.S.C. § 2617(c). This case was filed over five years after his employment in Ohio was terminated.

[5]For example, Rutland has not alleged that there was any similarly situated employee who was not African American who was treated better than he was by Target. *See, e.g., Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013) (setting forth requirements of a prima facie case under the indirect method).

8

*Thorntons, Inc.,* 731 F.3d 699, 710 (7th Cir. 2013). Rutland does not have any direct evidence of discrimination, which "would require something akin to an admission by [Target] that it fired [him] because of [his race]." *Id.* Under the direct method using circumstantial evidence, Rutland must "construct a convincing mosaic" that "allows a jury to infer intentional discrimination by the decisionmaker." *Id.* (citation omitted).

> Generally, but not exclusively, the pieces of that "mosaic" will fall into three categories. The first includes "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn." The second is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." And the third is "evidence that the employer offered a pretextual reason for an adverse employment action."

*Id.* at 711.

In this case, the only evidence Rutland points to that has anything to do with race are the comments by Geary quoted above. Racially tinged comments by a decisionmaker, or one, like Geary, who had input into the adverse employment decision, can support a claim for race discrimination if they are made "(1) around the time of, and (2) in reference to, the adverse employment action complained of" because "then it may be possible to infer that the decision makers were influenced by those feelings in making their decision." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000). This is not such a case, however. None of the racially tinged statements Rutland attributes to Geary were made in reference to the decision to terminate Rutland. The fact that racist comments were made is not, by itself, sufficient to support the inference that the decision to terminate Rutland was motivated by racial animus; the "circumstantial evidence must point directly to a discriminatory reason for the termination decision." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006) (citing *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003) (statements regarding plaintiff's age did not

9

form a convincing mosaic of circumstantial evidence sufficient to prevail under direct method where the prejudicial views were not clearly linked to termination decision)).

The comments by Geary, while inappropriate, are simply not sufficient to sustain a claim for race discrimination.  Rutland points to nothing else that suggests that Target terminated him because of his race.  Accordingly, Target is entitled to summary judgment on Rutland's Title VII claim.

### IV.  CONCLUSION

For the reason set forth above, the Court **GRANTS** summary judgment in favor of Target on all of Rutland's claims.

SO ORDERED: 11/26/2013

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Copy by United States Mail to:**

**Duwayne Rutland**
**660 Windrow Ave. Apt. 1**
**Columbus, OH  43207**

Copies to all counsel of record via electronic notification